UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff,<br>v.<br>KAREEM LACAYO,<br>Defendant. | Case No. 21-cr-00254-EMC-1<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO SUPPRESS**<br><br>Docket No. 43 |

## I.     INTRODUCTION

In December of 2019, three San Francisco Police Department ("SFPD") officers detained Mr. Lacayo and two other men after a 911 caller reported that, among other things, there was a 100-person fight in Franklin Square Park in San Francisco and that three men at the park, including a Black man wearing a black jacket, had guns. Mr. Lacayo contends that the stop was unlawful and that all evidence obtained from it must be suppressed. For the reasons explained below, because the Court finds that the officers lacked reasonable suspicion at the time that they seized Mr. Lacayo, the seizure was unconstitutional and all fruits of that unlawful seizure—including the firearm and ammunition located during the search of the Honda Civic—must be suppressed. The Court thus **GRANTS** Mr. Lacayo's motion to suppress.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

A.     911 Call Reporting Fight at Franklin Square Park

On December 23, 2019, at approximately 11:09:00 a.m.,[1] SFPD dispatch received a 911

---

[1] The parties dispute the precise timing of the events leading up to the seizure. *See* Reply at 3–4. Because the timing when the officers received certain information bears on the constitutionality of

call from an individual who identified himself as "Melvin."[2] Ex. 1 (SFPD Computer Aided Dispatch, or "CAD") at 7; Ex. G[3] (audio file of 911 call) at 6:18. The call was traced to Franklin Square Park in San Francisco where Melvin reported an ongoing fight involving approximately 100 individuals—three of whom Melvin reported to have weapons, specifically guns. *See* CAD at 1; Ex. G at 1:28–2:17. The 911 operator noted that shouting was heard in the background. *See* CAD at 1 ("CT CAN HEAR MALES YELLING IN BACKGROUND") (11:12:56 a.m.[4]).

Melvin reported that one individual with a gun was a Black male, around 25 years old, 165 centimeters tall, slim-to-medium build, wearing a black jacket and grey pants. Ex. G at 2:18–3:31. When asked to describe the gun, Melvin said that he had not actually seen a weapon but believed that the man had a gun inside a backpack. *Id.* at 3:32–4:45. The record does not reveal why Melvin believed that there was a gun in the backpack.

A few minutes later, Melvin repeated to dispatch that he believed three men had guns and that "it" was gang related.[5] *Id.* at 4:38–5:11. He said that one of the men was wearing a black hat and blue jeans. *Id.* at 4:43–4:53. When prompted by the operator, Melvin said that there was a second individual wearing a green sweater and that all together there was "a Black guy and two

---

the seizure, the defense retained an expert to review audio recordings produced in discovery and subpoenaed from the San Francisco Department of Emergency Management ("SFDEM"), as well as the officers' BWC footage. *See* Mot. at 1 n.2. After listening to the timestamps heard on the SFDEM audio recordings, the expert superimposed timestamps on Exhibits G–I. *Id.* The Government challenges the accuracy of these superimposed timestamps. As the timestamps for certain events are contested, the Court places limited weight on specific timestamps and focuses its analysis on the chronology of events. Where relevant, the Court relies upon the timestamps on the SFPD Computer Aided Dispatch ("CAD") as well as the times recalled by Officer Cummins in his declaration. But the weight of the Court's analysis flows from the *sequence* of events as opposed to *exact timing*.

[2] Melvin was primarily Spanish-speaking, so a Spanish interpreter was connected to the call to assist the 911 operator. Ex. G at 0:40.

[3] Numbered exhibits refer to the Government's exhibits and lettered exhibits refer to Mr. Lacayo's exhibits. Unless otherwise noted, the numbered exhibits are found at Docket No. 47 and the lettered exhibits are found at Docket No. 44.

[4] The timestamps for the Government's Exhibit 1, the San Francisco Police Department Computer Aided Dispatch ("CAD"), refer to the timestamps on the CAD.

[5] It is not clear from the audio recording what "it" was referring to. Possibly, Melvin intended to convey that the entire park altercation was gang related. Alternatively, Melvin may have meant that the three men with guns were gang related.

1  Hispanics." *Id.* at 5:28–5:38.

2  When asked if he saw the officers on the scene at the park, Melvin responded that he did not see them. *Id.* at 5:40–6:07. The operator then instructed Melvin to "flag" the officers who were "searching the park" because they had reported that there were "a few subjects that match[ed] that description." *Id.* at 6:53–7:00. Melvin responded "okay" and hung up. *Id.* at 7:10–7:16. The call lasted approximately seven minutes. *Id.* The record reflects that Melvin did not find the police on the scene and dispatch was unable to reconnect with him, despite numerous attempts. *See* CAD at 2.

B.  SFPD Officers Arrive on the Scene and Seize the Honda Civic

While the 911 dispatch operator was speaking with Melvin, the San Francisco Department of Emergency Management ("SFDEM") dispatchers were simultaneously relaying Melvin's information to SFPD officers. *See* CAD at 1. At 11:11:59 a.m., dispatch broadcasted that there was a 100-person altercation in the park and that weapons were involved. *Id.* ("PHYSICAL W/WEAPONS . . . STATING '100 PEOPLE INVOLVED' . . . #1 HAS A 221[6]"). At approximately 11:12:56 a.m., the description of the first Black male identified by Melvin was reported on the CAD readout[7] as well as communicated by radio to the responding officers. CAD at 1 ("BMA, 25 YO, 5'5-5'6, SLIM TO MED . . . BLK JKT, GREY PANTS . . . ."); Ex. 4 (audio file of SFPD Dispatch Audio); *see also* Ex. 3 (Declaration of Patrick Cummins, or "Cummins Decl.") ¶ 8 (stating that "around 11:12 am, I observed the CAD readout, which stated that one suspect with a gun was a "BMA"—or black male—"25 YO"—or 25 years old—"5'5-5'6, SLIM TO MED"—with a height of 5'5 to 5'6 feet tall, of a slim to medium build—in a black jacket and grey pants"). Additionally, dispatch relayed that the 911 operator could hear males shouting in the background. Ex. 4 at 0:59.

SFPD Unit 3D74—which included Officers Vincent Masilang, Patrick Cummins, and

---

[6] A "221" is a code for person with a gun. Mot. at 3 n.6; Ex. L (SFPD radio codes) at 2.

[7] The CAD readout was available to SFPD officers reporting to the scene who had access to the computer terminal, including the unmarked SUV driven by Officer Cummins on December 23, 2019. Ex. 3 (Declaration of Patrick Cummins, or "Cummins Decl.") ¶ 2.

3

Michael Mayo—heard and quickly responded to the broadcast about the fight at Franklin Park. *See* CAD at 2; Cummins Decl. ¶ 5. At approximately 11:14:30 a.m., Unit 3D74 reported that they were "coming in 97," indicting that they were in the vicinity of Franklin Square Park and would respond to the incident. CAD at 2; Ex. H (audio file of radio channel DT14). A few seconds later, Officer Cummins asked dispatch to provide "the details" of the 911 call. Ex. H at 0:20. The dispatcher responded that there were "100 people involved in a 418[8]" and one individual with a "221" was "a BMA, 25 years old, 5'5 to 5'6, slim to medium build, black jacket, grey pants." *Id.* at 0:22–0:32. The dispatcher further informed Officer Cummins that the "221 was inside a backpack." *Id.* at 0:34. A few seconds later, the dispatcher clarified that the caller had not actually seen a gun but "the subject said he had a gun." *Id.* at 0:38–0:49 ("Again the RP did not see a 221, believes it's gang related."). Meanwhile, at 11:14:50 a.m. on the CAD readout, dispatch reported that there were three suspects with guns reported in the park. CAD at 2 ("STATING AT LEAST 3 221S IN THE PARK."). The descriptions of the other two reported individuals were not broadcasted until later, at 11:16:11 a.m. CAD at 2; Cummins Decl. ¶ 12.

Around 11:14:50 a.m., Unit 3D74 arrived at the scene in an unmarked police SUV driven by Officer Cummins. Cummins Decl. ¶ 6. Officer Cummins pulled the SUV into the park's driveway which led up a short hill and into the park's only parking lot. *Id.* ¶ 10. The driveway had cars parked along one side, allowing only one car to drive in or out of the parking lot at a time. *Id.* Officer Cummins drove the SUV partway up the hill where he stopped to let Officers Mayo and Masilang exit the vehicle. *Id.*; Ex. 5 (Declaration of Michael Mayo, or "Mayo Decl.") ¶ 9. All three officers were wearing body cameras, which were turned on and recorded the ensuing events. *See* Docket No. 44 (Declaration of Elisse Larouche, or "Larouche Decl.") ¶¶ 4, 6. Officers Mayo and Masilang walked up the driveway while Officer Cummins drove the SUV a few more feet to the top of the driveway where he first saw a silver Honda Civic driving toward the exit. Ex. I (Officer Masilang's BWC footage, or "Masilang BWC") at 0:09–0:40; Ex. D (Officer Mayo's BWC footage, or "Mayo BWC") at 0:25–0:49; Ex. K (SFPD incident report) at 7.

---

[8] A "418" is a code for a fight. Ex. L (SFPD radio codes) at 3.

4

The officers would eventually learn that the Civic was driven by Robert Spears, with Mr. Lacayo in the passenger seat and Amir Alkhraisat in the rear seat. Ex. M (Declaration of Robert Spears, or "Spears Decl.") ¶ 2. Mr. Spears is a black male and was wearing a green shirt; Mr. Lacayo is a black male and was wearing a black jacket; and Mr. Alkhraisat is a Latino male. Cummins Decl. ¶¶ 13, 17. At the point that the officers first saw the Civic, though, the officers were only aware of the physical description of the first male suspect ("BMA, 25 years old, 5'5 to 5'6, slim to medium build, black jacket, grey pants and had a backpack") and that three men were reported to have guns.

As the police SUV drove the short distance up the driveway, Officer Cummins again asked for the description of the suspect which the dispatcher relayed once more. Mayo BWC at 0:37–0:44; Ex. H at 0:55–1:04 (stating "BMA, 25 years old, 5'5 to 5'6, slim to medium build, black jacket, grey pants and had a backpack").[9] Despite the fact that there was room for the SUV to proceed out of the driveway, Officer Cummins stopped the SUV in the middle of the driveway, blocking the only exit of the parking lot. Mayo BWC at 0:49; Masilang BWC at 1:12.

Seconds later, Officer Cummins reported to dispatch "I see his car." Cummins Decl. ¶ 11; Masilang BWC at 1:18; Ex. H at 1:17. Meanwhile, Officer Masilang approached the Honda Civic on foot and circled around the back of the vehicle to the passenger side. Masilang BWC at 1:20–1:34. As explained below, by this point, the officers had seized the Honda Civic and its occupants.

At approximately 11:15:45 a.m., shortly after Officer Cummins had reported seeing the car, Officer Cummins reported the temporary license plate number of the Honda Civic to dispatch. CAD at 2 (indicating the license plate was read to dispatch at 11:15:44 a.m.); Ex. H at 1:29–1:32; Cummins Decl. ¶ 11 (stating that "[a]t around 11:15:52 am, I reported that [*sic*] observed a Silver Honda Civic, with temporary plate ending in -9X35, appearing to be preparing to leave the parking lot"). Almost immediately after reading the temporary plate number, Officer Cummins

---

[9] Around the same time, another SFPD unit responding to the scene asked on a different radio channel if there was "anything further on the description" of the suspect with the gun because "there's gonna be a lot of people out there matching" the description provided. Ex. A-2 at 0:38–1:05 (audio file).

5

1  exited the SUV.  *See* Mayo BWC at 1:19 (Officer Cummins can be heard reporting the temporary

2  license plate number to dispatch and then can be seen exiting the SUV seconds later); *see also*

3  Masilang BWC at 1:30–1:35 (Officer Cummins can be seen exiting his car within seconds of

4  reporting the temporary plate number).

5        Shortly after Officer Cummins had parked and left the SUV, a physical description of the

6  other two suspects was relayed on the CAD.  CAD at 2.[10]

7  C.     The Officers Detain the Vehicle Occupants and Subsequently Search the Honda Civic

8        As Officers Mayo and Masilang approached either side of the Honda Civic, *see* Mayo

9  BWC at 1:18; Masilang BWC at 1:30, Officer Cummins approached the driver-side window and

10  instructed the driver to turn off the car.  Mayo BWC at 1:26; Masilang BWC at 1:40–1:48.  He

11  informed the vehicle occupants that there was a fight in the park and the Honda Civic matched a

12  description related to the fight.  Mayo BWC at 1:26–1:37.  Meanwhile, Officer Masilang

13  approached the passenger-side window and began questioning Mr. Lacayo and Mr. Alkhraisat

---

[10] The Court acknowledges that Officer Cummins purports to have read the CAD and seen the partial physical descriptions of the other two men *before* exiting the vehicle.  *See* Cummins Decl. ¶¶ 12, 17.  But based on the Court's independent review of the evidentiary record, Officer Cummins was not in the vehicle when the descriptions of the other two suspects were broadcast, and thus had no way of knowing the additional descriptions.  Specifically, the CAD indicates that the license plate number was reported at 11:15:44 a.m. and the BWC footage shows Officer Cummins exiting the SUV approximately three seconds after reporting the plate number.  *See* Masilang BWC at 1:32–1:35 (showing the length of time between when Officer Cummins finishes reading the license plate and when Officer Cummins is visible outside of the SUV).  Because Officer Cummins exited the vehicle within seconds of reading out the license plate number at 11:15:44 am, he could not have seen the description of the other men come through on the CAD at 11:16:11 am; he had already exited the vehicle.  *Compare* Cummins Decl. ¶ 12, *with* CAD at 2.

In any event, though, the question of whether Officer Cummins read the CAD before or after exiting the vehicle is not dispositive because the seizure occurred before Officer Cummins left the SUV.  The Honda Civic and its occupants had been seized by the time Officer Cummins read the license plate number to dispatch because the police SUV was stopped in the exit of the driveway while Officer Masilang approached the Honda Civic from behind, thus, conveying to the occupants that they were not at liberty to leave.  Therefore, even if Officer Cummins read the CAD before exiting the SUV, it is irrelevant because the seizure had already occurred.

There appear to be other discrepancies in the Cummins Declaration.  For example, in paragraph fourteen he states that "[a]t around 11:16:49 am, I radio to my colleagues that the Honda Civic contains three individuals matching the description of the three suspects with guns." Cummins Decl. ¶ 14.  However, as Defendant points out, the evidence shows that Officer Cummins radioed "right here" and "I see his car" but there is no evidence of him radioing that the individuals matched the description of the suspects.  Mot. at 8; *see also* Mayo BWC at 0:47–0:50; Masilang BWC at 1:10–1:18; Ex. H at 1:09–1:17.

while Officer Mayo approached the driver-side of the vehicle and stood next to Officer Cummins. Masilang BWC; Mayo BWC. When the officers asked the vehicle occupants for identification, Mr. Spears stated that he did not have his ID on him because they "just played a soccer game and left all our stuff at the house." Mayo BWC at 1:30–1:44. Mr. Lacayo and Mr. Alkhraisat responded similarly. Masilang BWC at 02:02.

The officers then asked the men for their names and whether anyone was on probation or parole. Mayo BWC at 1:50; Masilang BWC at 2:05. Mr. Spears, the driver of the Civic, truthfully informed Officer Cummins that his name was Robert Spears. Mayo BWC at 1:57–2:00. Mr. Alkhraisat similarly relayed his name to Officer Cummins. *Id.* at 2:30. Mr. Lacayo, however, gave a false name and fictitious birth date to Officer Masilang. Masilang BWC at 2:35–2:56.

While running the names of the vehicle occupants, Officer Mayo approached the passenger side of the vehicle at which point he recognized the front passenger as Kareem Lacayo.[11] Masilang BWC at 5:50. Officer Mayo then instructed Mr. Lacayo to exit the car and placed him in handcuffs for knowingly providing false identification to a police officer in violation of California Penal Code § 148.9. Mayo Decl. ¶ 3.

Shortly after, the officers determined that Mr. Alkhraisat was subject to a pretrial search condition. He too was instructed to exit the car and subsequently put in handcuffs. Masilang BWC at 7:30–8:45.

After running a computer record check of Mr. Spears, Officer Cummins discovered that Mr. Spears had a suspended license. Cummins Decl. ¶ 4. At that time, Officer Cummins instructed Mr. Spears to exit the vehicle because he was not lawfully able to drive, and he too was placed in handcuffs for violating California Vehicle Code § 14601. *Id.*

Once all three men were out of the vehicle and handcuffed, Officer Mayo searched the Honda Civic. Mayo BWC at 13:40. Under the front passenger seat, officers removed a green bag in which they found a gun and ammunition. *Id.* at 15:40. In the rear passenger seat, Officer Mayo

---

[11] Officer Mayo was "personally familiar" with Mr. Lacayo due to their previous interactions together. Mayo Decl. ¶ 13. Officer Mayo had previously conducted parole searches of his person and his residence, and also knew him through Mr. Lacayo's purported association with the Sureno gang. *Id.*

1  found a black backpack with a gray ski mask inside.  Mayo Decl. ¶ 17; Ex. 8 (Incident Report of

2  Officer Patrick Cummins) at 2.  Pursuant to what the officers believed to be SFPD tow policy, the

3  Civic was driven back to the Mission Station for further investigation.  Ex. 8 at 2; *see* Opp. at 7

4  (citing Ex. 12 (SFPD General Order 9.06)).

D. Procedural History

6        On June 9, 2021, the Government filed a complaint charging Mr. Lacayo with one count of

7  Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g)(1).  On June 17, 2021, the

8  Government filed an indictment charging Mr. Lacayo with one count of Felon in Possession of a

9  Firearm and Ammunition, in violation of 18 U.S.C. § 922(g)(1).  On June 29, 2022, Mr. Lacayo

10 filed this motion to suppress.  Docket No. 43 (Motion to Suppress, or "Mot.").  The Court heard

11 oral argument from the parties on October 6, 2022.  *See* Docket No. 64.

12       The matter is thus fully briefed and ripe for adjudication.

### III. LEGAL STANDARD

14       Under the Fourth Amendment, people have the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV; *see also United States v. Jones*, 565 U.S. 400, 404 (2012).  A search within the meaning of the Fourth Amendment occurs when "the [G]overnment intrudes upon an expectation of privacy that society is prepared to consider reasonable." *Lavan v. City of Los Angeles*, 693 F.3d 1022, 1027 (9th Cir. 2012) (citing *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)).  An officer seizes a person for Fourth Amendment purposes when he, "through coercion, physical force, or a show of authority, in some way restricts the liberty of [that] person." *United States v. Washington*, 387 F.3d 1060, 1068 (9th Cir. 2004) (internal quotations and citations omitted).  An officer restricts a person's liberty when, taking into consideration "all of the circumstances surrounding the encounter, the police conduct 'would have communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business.'" *Id.* (quoting *Florida v. Bostick*, 501 U.S. 429, 437 (1991)).

      A search or seizure made "without a warrant . . . [is] *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*

United States District Court
Northern District of California

*v. United States*, 389 U.S. 347, 357 (1967). Those exceptions include: (1) a search with consent, *Florida v. Jimeno*, 500 U.S. 248, 250–51 (1991) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)); (2) the brief detention of a suspect if an officer has reasonable suspicion to believe that criminal activity is afoot, *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)); (3) a limited frisk if an officer has reasonable suspicion to believe that a suspect is armed and dangerous, *Terry v. Ohio*, 392 U.S. 1, 27 (1968); and (4) the search of a vehicle with probable cause to believe that evidence of a crime will be found there, *United States v. Ross*, 456 U.S. 798, 823–24 (1982).

In the case of a warrantless search or seizure, the Government bears the burden of proving, by a preponderance of the evidence, that the warrantless search or seizure falls within an exception to the warrant requirement. *United States v. Hawkins*, 249 F.3d 867, 872 (9th Cir. 2001); *see also United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987) ("The [G]overnment must prove the existence of an exception to the Fourth Amendment Warrant Requirement by a preponderance of evidence.").

## IV.     DISCUSSION

Mr. Lacayo contends that the officers seized him in violation of the Fourth Amendment and that all evidence obtained from the unconstitutional search must be suppressed. Mot. at 10. The Court agrees. As discussed below, the Court finds that Mr. Lacayo has standing to challenge the seizure and that the officers lacked reasonable suspicion to seize him.

A.     <u>Mr. Lacayo Has Standing to Challenge the Constitutionality of the Seizure</u>

The Government first argues that Mr. Lacayo lacks standing to challenge the constitutionality of the search of the car. Opp. at 21. Specifically, the Government argues that because Mr. Lacayo was a "mere passenger" of the vehicle, he can claim "no reasonable expectation of privacy in [the] car." Opp. at 21 (quoting *United States v. Twilley*, 222 F.3d 1092, 1095 (9th Cir. 2000)). But this mischaracterizes Mr. Lacayo's position: Mr. Lacayo challenges "the *initial seizure* of the Civic," arguing that the Government lacked sufficient cause when the officers first stopped the car. Mot. at 7 (emphasis added); Reply at 1 ("Mr. Lacayo specifically challenges the officers' warrantless stop of the Civic—and his resulting seizure as a passenger.").

9

For the reasons discussed below, because Mr. Lacayo has standing to challenge the initial seizure of the vehicle, he may challenge the ensuing searches.

"A person is seized by the police and thus entitled to challenge the government's actions under the Fourth Amendment when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007) (internal citations omitted). And it is well established, "that in Fourth Amendment terms a traffic stop entails a seizure of the driver 'even though the purpose of the stop is limited and the resulting detention quite brief.'" *Id.* at 255 (quoting *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). Importantly, "during a traffic stop an officer seizes *everyone in the vehicle*, not just the driver." *Brendlin,* 551 U.S. at 255 (emphasis added) (holding that Brendlin, a passenger in the vehicle, was seized within the meaning of the Fourth Amendment, and thus could challenge the constitutionality of the traffic stop). Thus, a passenger of a seized vehicle has standing to challenge the constitutionality of the stop. *Id.* at 251; *see also Twilley*, 222 F.3d at 1095 (stating that "a passenger may challenge a stop of a vehicle on Fourth Amendment grounds even if she has no possessory or ownership interest in the vehicle[;]" therefore, "while Twilley does not have standing to challenge the search directly, if the defendant could establish that the initial stop of the car violated the Fourth Amendment, then the evidence that was seized as a result of that stop would be subject to suppression as fruit of the poisonous tree") (internal quotations omitted).

The officers seized the Honda Civic when Officer Cummins blocked the parking lot exit with the police SUV, essentially trapping the Honda Civic, and Officer Masilang approached the Honda Civic because this communicated to the vehicle occupants that they were "not free to leave." *Washington*, 387 F.3d at 1068; *see also United States v. Kerr*, 817 F.2d 1384, 1387 (9th Cir. 1987) (holding that "Kerr's freedom to depart was restrained the moment Deputy Hendrick blocked the one-land driveway"). Therefore, under *Brendlin*, Mr. Lacayo—as a passenger of the vehicle—was seized within the meaning of the Fourth Amendment and has standing to challenge the constitutionality of that seizure.

In sum, the Court concludes that Mr. Lacayo has standing to challenge the initial seizure and subsequent actions taken by the officers following that seizure. The critical question,

therefore, is whether the officers had reasonable suspicion for the initial seizure of the Honda Civic and its occupants.

B.  <u>The SFPD Officers Lacked Reasonable Suspicion to Seize Mr. Lacayo</u>

Because the officers' actions were undertaken in the absence of a warrant, the officers were required to have reasonable suspicion to conduct the initial stop. For the reasons explained below, the Court concludes they did not.

"Under the Fourth Amendment, an officer may conduct a brief investigative stop only where []he has 'a particularized and objective basis for suspecting the particular person stopped of criminal activity,' commonly referred to as 'reasonable suspicion.'" *United States v. Vandergroen*, 964 F.3d 876, 879 (9th Cir. 2020). Reasonable suspicion "exists when an officer is aware of specific, articulable facts which, when considered with objective and reasonable inferences, form a basis for *particularized* suspicion." *United States v. Montero-Camargo*, 208 F.3d 1122, 1129 (9th Cir. 2000) (emphasis in original). Particularized suspicion is "based upon the totality of the circumstances" and "must arouse a reasonable suspicion that *the particular person being stopped* has committed or is about to commit a crime." *Id.* (emphasis in original).

A tip can support reasonable suspicion if it has "sufficient indicia of reliability" and it "provide[s] information on potentially illegal activity serious enough to justify a stop." *Vandergroen*, 964 F.3d at 879 (citing *United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014)). When determining the reliability of a tip, courts consider the following factors: (1) "whether the tipper is known, rather than anonymous;" (2) "whether the tipper reveals the basis of his knowledge;" (3) "whether the tipper provides detailed predictive information indicating insider knowledge;" (4) "whether the caller uses a 911 number rather than a non-emergency tip line;" and (5) "whether the tipster relays fresh, eyewitness knowledge, rather than stale, second-hand knowledge." *Id.* at 879–80 (internal citations omitted).

The Government argues that the totality of circumstances "demonstrates that the 911 call was sufficiently reliable to support the officers' reasonable suspicion." Opp. at 14. In particular, the Government cites the following facts and authorities:

(1) "the call was placed by an eyewitness 'using an emergency line, which allows calls to

be recorded and traced, increase[ing] his credibility,'" Opp. at 14 (quoting *Vandergroen*, 964 F.3d at 880);

(2) the caller "relayed contemporaneous and detailed information . . . that he himself was observing" and the operator noted that she could hear men shouting in the background of the call, Opp. at 15;

(3) "SFPD arrived on the scene within minutes of the 911 call being placed . . . [and] [t]his type of 'contemporaneous report' 'is especially reliable,'" Opp. at 16 (quoting *Navarette v. California*, 572 U.S. 393, 395 (2014));

(4) "upon SFPD officers' arrival, they immediately located three men closely matching the physical descriptions provided by Melvin: a black male of medium build in his 20s wearing a black jacket with grey sweatpants and a backpack, a black male in a green shirt, and a male of Latino appearance," Opp. at 16; and

(5) "the front passenger behaved nervously upon the arrival of SFPD to the scene and appeared to be hiding something under his seat," Opp. at 16.

It is true that Melvin provided dispatch with his first name, making him slightly less anonymous. Ex. G at 6:18. However, he did not give his last name, and so his identification was thus unknown. Whether his identity could eventually be obtained via 911 cell tracing is not clear. It is also true that Melvin purported to have first-hand knowledge: he told the operator that the fight was ongoing while he was on the 911 call. *Id.* at 1:08. This is supported by the fact that the operator reported to hear men shouting in the background of the call. CAD at 1.

But there was limited value to Melvin's information. Melvin eventually admitted on the call that he did not see the gun himself; nor did he provide any basis for believing that three men had guns. Ex. G at 3:32–4:45. Importantly, Melvin did not provide any "predictive information" at any point to the operator. *Cf. Alabama v. White*, 496 U.S. 325, 332 (1990) (holding that an anonymous tip stating that at a specific time in the future a woman would leave a specific apartment building with cocaine, get into a car matching a particular description, and drive to a specific motel was sufficiently reliable only after "significant aspects of the caller's predictions were verified" by the police officers' observations); *see also United States v. Rowland*, 464 F.3d

899, 908–09 (9th Cir. 2006) (finding that tip established reasonable suspicion where informant predicted defendant's future travel from Hawaii to Guam). In fact, the events that he reported were *not* corroborated by the officers' experiences: upon the officers' arrival—which occurred within minutes of the 911 call—there was no evidence of a 100-person fight taking place within the park.[12] Melvin made no reference to the suspects approaching or driving/riding in a car.

Additionally, the Government's analysis erroneously relies on information and facts that were not known by the officers until *after* the initial seizure had already taken place. As explained above, the evidentiary record demonstrates that the officers did not learn the physical descriptions of the second and third suspects until after Mr. Lacayo had already been seized. Reasonable suspicion and the reliability of a tip must be evaluated "in light of the facts and circumstances *then* known" to the officers at the time the search or seizure occurred. *Moreno v. Baca*, 431 F.3d 633, 639 (9th Cir. 2005) (emphasis added) (quoting *Scott v. United States*, 436 U.S. 128, 137 (1978)); *see also Ornelas v. United States*, 517 U.S. 690, 696 (1996) ("We have described reasonable suspicion simply as 'a particularized and objective basis' for suspecting the person stopped of criminal activity . . . where the *known facts and circumstances* are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.") (emphasis added) (citation omitted); *see also United States v. Terry-Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (stating that the relevant analysis is whether the "911 call provided the police with sufficient indicia of reliability *prior* to the *Terry* stop to justify reliance on it") (emphasis in original). Thus, reasonable suspicion must be established based on the information known to the officers at the time they seized Mr. Lacayo—by the time the temporary license plate number was read to dispatch, at which point Officer Cummins had blocked the exit of the driveway and Officers Masilang and Mayo approached either side of the vehicle.

In sum, at the time that the seizure occurred, the officers were aware of the following information:

---

[12] *See* Mayo BWC at 3:10–3:50, 4:35–4:40 (Officer Mayo's BWC shows him approach the soccer field adjacent to the parking lot where a soccer game was taking place with no indication of a fight).

13

1    (1) a civilian had reported a 100-person fight in Franklin Square Park involving weapons, a fact not corroborated by officers' observations upon arriving at the scene;[13]

(2) one individual reported as having a gun was a black male, 25 years old, 5'5 to 5'6, slim-to-medium build, wearing a black jacket and grey pants, and the gun was believed to be inside a backpack;[14]

(3) the operator could hear yelling in the background of the 911 call (with no basis stated for that belief);[15]

(4) the reporting civilian (Melvin) did not actually see the gun himself, but "the subject said he had a gun" and Melvin believed that it was gang related;[16] and finally

(5) that there were at least three individuals believed to have guns.[17]

As previously mentioned, the officers did not have *any* information regarding or description of the other men reported to have guns at the time of the seizure.[18] And although the officers were informed that the incident was supposedly "gang related," *see* Ex. H at 0:47–0:49, at no point were the officers told that the three men were suspected to be together. Nor was there any information that the reported suspects were in, or near, or even approaching a car. Importantly, because the three men were seated in the car at the moment of the seizure, the officers would not have been able to identify the occupants' height, build, pant color, or whether they had a backpack. Therefore, the *only* facts that could give rise to reasonable suspicion at the

---

[13] *See* CAD at 1 ("THRU INTERPRETER 353012 . . . HAMPSHIRE/17TH CORNER . . . PHYSICAL W/WEAPONS . . . RP STATING '100 PEOPLE INVOLVED . . . #1 HAS A 221.'") (11:11:59 a.m.); Ex. H at 0:17–0:26.

[14] *See* CAD at 1 ("BMA, 25 YO, 5'5-5'6, SLIM TO MED . . . BLK JKT, GREY PANTS . . . .") (11:12:56 a.m.); Ex. H at 0:26–0:36.

[15] *See* CAD at 1 ("CT CAN HEAR MALES YELLING IN THE BACKGROUND.") (11:12:56 a.m.).

[16] *See* Ex. H at 0:42–0:49.

[17] *See* CAD at 2 ("STATING AT LEAST 3 221S IN THE PARK.") (11:14:50 a.m.).

[18] *See* CAD at 2 (indicating that the license plate number was reported at 11:15:44 a.m. but the description of the other two suspects, "#2 BMA, GRN SHIRT . . . #3 LMA," was not reported until 11:16:11 a.m.); *see also* Section II.B *supra*.

14

time of the seizure are that the car contained three individuals: two black males, one of which appeared to be in his twenties, slim to medium build, wearing a black jacket, and an individual in the back that appeared to be male but could not otherwise be identified.[19]

These factors do not amount to reasonable suspicion. "Where . . . the majority (or any substantial number) of people share a specific characteristic, that characteristic is of little or no probative value" when determining reasonable suspicion. *Montero-Camargo*, 208 F.3d at 1131 (holding that the "Hispanic appearance" of the three defendants was "of such little probative value" that it could "not be considered as a relevant factor where particularized or individualized suspicion is required"); *see also Melendres v. Arpaio*, 598 F. Supp. 2d 1025, 1033 (D. Ariz. 2009) (stating that "the Ninth Circuit has found that an individual's race, standing alone, is not an appropriate factor for assessing reasonable suspicion under the totality of the circumstances"). That one suspect was a black man in his twenties, slim to medium build, wearing a black jacket, did not establish reasonable suspicion. Notably, the officers could not see the color of the pants of the occupants, nor their heights. A "substantial number of people" showed these characteristics of a black male in his twenties, with a black jacket in the context of a late morning in a major urban city. As one responding officer complained, this description was too generalized and requested further information because "there's gunna be a lot of people out there matching" the description provided to the officers. Ex. A-2 at 0:38–1:05. The fact that two individuals in the vehicle were black males is of little probative value.

*Florida v. J.L.* illustrates the problem here. In that case, the Supreme Court determined that no reasonable suspicion arose from an anonymous tip that a young black male in a plaid shirt standing at a bus stop was carrying a gun. *Florida v. J.L.*, 529 U.S. 266, 268 (2000). The Court came to this holding because the tipster did not explain the basis for his knowledge or provide any predictions of future behaviors that could be corroborated by the police. *Id.* at 271–72. Similarly,

---

[19] Officer Cummins stated the following in his report: "I observed that the driver was a black male in a green shirt and the front passenger was a black male in his 20s in a black shirt of slim to medium build . . . . I observed that there was a passenger in the back seat of the vehicle but was unable to identify any physical characteristics because of the distance and obstructed view, other than my impression that the back passenger appeared to be a male." Cummins Decl. ¶ 13.

15

here, Melvin failed to provide the basis for his alleged knowledge of the guns, and he did not provide any predictive movements. Thus, the mere fact of a black male in a black jacket—with no indication that he was in a car, about to enter a car, or even in the parking lot—is insufficient to amount to reasonable suspicion in the absence of *any* predictive information.

The cases relied on by the Government are readily distinguishable from the facts at hand. *See* Opp. at 12–14 (citing *Vandergroen*, 964 F.3d 876; *Navarette*, 572 U.S. at 395; *Foster v. City of Indio*, 908 F.3d 1204 (9th Cir. 2018); *Terry-Crespo*, 356 F.3d at 1172).

In *Vandergroen*, the Ninth Circuit held that the totality of circumstances demonstrated that a bar employee's 911 call was sufficiently reliable to support reasonable suspicion. 964 F.3d at 880. Specifically, the caller reported that three patrons of the bar believed they saw a "HMA wearing a blue sweatshirt with a Warriors logo on it" carrying a pistol. *Id.* The caller also gave detailed information about where the suspect was headed and that he "just got into a black vehicle . . . getting into a 4-door sedan, black in color . . . ." *Id.* at 878–79. Because the 911 caller was reporting information from a third party, *i.e.*, bar patrons, the court determined that it was necessary to analyze the reliability of both the caller and the third parties. *Id.* The court ultimately held that the caller was reliable because: (1) he provided both his name and his employment position, thus, "making him more known, and therefore more reliable;" (2) "he revealed the basis of his knowledge;" and (3) he placed the call using a recorded and traceable emergency line. *Id.* As for three bar patrons, the court found that they were reliable primarily because: (1) the patrons reported that they had seen the gun, thus, the report was based on first-hand knowledge; (2) the patrons remained at the bar while the call was placed to 911, "narrow[ing] the likely class of informants;" and (3) "[t]he fact that multiple individuals reported seeing a gun . . . made the information more reliable." *Id.* The details provided to the police in *Vandergroen* are significantly more particularized than those relayed to SFPD here. A blue sweatshirt with a Warriors logo is more detailed than a "black jacket." The caller provided his name and employment position, not just a first name. The observation of the gun was firsthand and corroborated by others. And, importantly, the caller provided "predictive information" about the suspect's movement, including that he was getting into a black car. Here, Melvin did not provide

1    *any* predictive information regarding the movement of the suspects. And despite the fact that
2    Melvin relayed contemporaneous information, he himself never saw the gun, nor did anyone else
3    corroborate his account.

4        *Navarette* is distinguishable because the caller provided particularized details as well as
5    predictive information. In that case, the caller reported that she had just been run off the road by
6    another driver in "a silver Ford F-150 pickup, license plate 8D94925" headed "southbound [on]
7    Highway 1 at mile marker 88." 572 U.S. at 395, 399. The Supreme Court determined that,
8    although the tip was anonymous, "under the totality of the circumstances, the officer had
9    reasonable suspicion that the driver was intoxicated." *Id.* Specifically, the Court found the tip
10   trustworthy because it reported eyewitness information that was detailed and provided predictive
11   movements that were later confirmed by the police. *Id.* at 399.

12       In *Foster*, the court held that that an anonymous 911 call supported reasonable suspicion
13   when the caller reported "eyewitness knowledge, coupled with sufficient detail on his description"
14   and the tip "predict[ed] [the] suspect's future actions." 908 F.3d at 1214. Specifically, the court
15   found the tip reliable because the caller stated that "he personally observed the suspect taking out
16   his gun," thus, claiming eyewitness knowledge of the concealed weapon and the caller "stated that
17   the suspect was walking down Highway 111 in the direction of the Subway and the smoke shops"
18   which was corroborated by the police when they encountered him. *Id.* And although the court
19   considered the fact that it was a recorded 911 call, that fact alone was not dispositive. *Id.*
20   Similarly, here, the fact that the caller placed a 911 call and provided his first name is not
21   sufficient alone to support reasonable suspicion. The caller's particularized and predictive
22   information makes *Foster* distinguishable from the facts here.

23       Finally, in *Terry-Crespo*, a caller placed a 911 call, reporting that the suspect had
24   threatened him with a gun a few minutes earlier. 356 F.3d 1170, 1172. While the court
25   emphasized the fact that the caller was not anonymous and placed a 911 call as opposed to using a
26   non-emergency line, the court also relied on other factors. *Id.* 1174–76. Specifically, the caller
27   had first-hand knowledge, due to the fact that he himself was the victim, allowing him to provide a
28   detailed description of the suspect and the weapon. *Id.* 1176–77. Additionally, the court

17

considered the fact that the caller reported more than "general criminality" by reporting a contemporaneous emergency event. *Id.* 1176. The court distinguished this from the 911 tip in *J.L.* where the anonymous tip reported "general criminality, simple possession of a firearm by a minor." *Id.*

As noted above, the caller, revealing only his first name, did not see the gun, only provided a general description of one suspect (as of the time of the seizure), and provided no predictive information which was subject to verification. Indeed, as noted above, his description of the event, a 100 person fight, was inconsistent with what the arriving officers saw.

Thus, because of the limited and general information known to the officers at the time they seized the vehicle and its occupants, the Government has not met its burden to show that there was reasonable suspicion for the initial stop.

C.      The Fruit of the Poisonous Tree Doctrine Applies

Because the officers did not have reasonable suspicion to justify their initial warrantless seizure of Mr. Lacayo, the fruits of that unlawful seizure—including the firearm and ammunition at issue in this case—must be suppressed.

"It is well established that, under the 'fruits of the poisonous tree' doctrine, evidence obtained subsequent to a violation of the Fourth Amendment is tainted by the illegality and is inadmissible . . . unless the evidence obtained was 'purged of the primary taint.'" *United States v. Washington*, 490 F.3d 765, 774 (9th Cir. 2007) (quoting *Wong Sun v. United States*, 371 U.S. 471, 488 (1963)); *see also United States v. Heltsley*, 33 F. App'x 270, 272 (9th Cir. 2002) (suppressing evidence derivative of an unlawful seizure of the defendant's vehicle under the fruits of the poisonous tree doctrine). "The [G]overnment has the burden to show that the evidence is not the fruit of the poisonous tree." *Twilley*, 222 F.3d at 1097 (quotations omitted).

The Government has failed to demonstrate that the evidence obtained after the unlawful seizure was "purged of the primary taint." First, the Government attempts to argue that the evidence within the car was lawfully obtained under the automobile exception. *See* Opp. at 23 ("Police may search an automobile and the containers within it without a search warrant when they have probable cause to believe it contains contraband or evidence of criminal activity.")

18

(citing *California v. Acevedo*, 500 U.S. 565, 580 (1991)).  This argument fails because the Government has not demonstrated that the officers had probable cause to search the vehicle based on the facts known to them when they seized the vehicle.  Probable cause requires "factual specificity that evidence of a crime will be found in a particular place." *United States v. Rodgers*, 656 F.3d 1023, 1029 (9th Cir. 2011).  Because the officers lacked reasonable suspicion to support the initial warrantless stop of the vehicle, it follows that probable cause cannot be established to support a search of the vehicle, given that probable cause is a higher standard than reasonable suspicion.  The offices cannot rely on evidence obtained *after* the unlawful seizure of the Honda Civic.

Second, the Government argues that "even if the initial *search* of the Honda Civic was deemed improper . . . the inevitable discovery doctrine would nevertheless apply."  Opp. at 24 (emphasis added).  Specifically, the Government argues that because the driver was arrested for driving with a suspended license, SFPD procedure would have required the officers to tow and then inventory the contents of the towed vehicle. *Id.* at 24–25 ("Where 'routine booking procedure and inventory would have inevitably resulted in discovery' of the evidence, the inevitable discovery doctrine allows for admission of that contraband.") (quoting *United States v. Andrade*, 784 F.2d 1431, 1433 (9th Cir. 1986)).  This argument is flawed because the Government overlooks the fact that the unlawful *seizure* of the vehicle tainted the *search* of the vehicle.  The Government has not shown that the officers would have discovered that the driver had a suspended license had they not unlawfully seized the vehicle and its occupants in the first place.  And there is no lawful predicate to the inventory search.  Therefore, the Government has failed to establish the applicability of the inevitable discovery doctrine.

The Court concludes that the Government has failed to meet its burden of establishing that the evidence is not fruit of the poisonous tree.

///

///

///

///

19

## V. CONCLUSION

For the foregoing reasons, the Court **GRANTS** Mr. Lacayo's motion to suppress.

This order disposes of Docket No. 43.

**IT IS SO ORDERED**.

Dated: November 28, 2022

_____
EDWARD M. CHEN
United States District Judge